IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


CINDY L. GARRETT,                          )
                                           )
v.                                         )          No. 2:06-0072
                                           )
MICHAEL J. ASTRUE,                         )
Commissioner of Social Security[1]         )


TO:    The Honorable Thomas A. Wiseman, Jr., Senior District Judge


**<u>REPORT AND RECOMMENDATION</u>**


        The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security denying her Disability Insurance Benefits

("DIB") under the Social Security Act ("the Act").

        Upon review of the Administrative Record as a whole, the Court finds that part of the

Commissioner's determination is supported by substantial evidence in the record as required by

42 U.S.C. § 405(g), that part of his determination is not supported by substantial evidence, and that

the plaintiff's motion for judgment on the record (Docket Entry No. 15) should be denied in part and

granted in part.

-------------------------

        [1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as
Commissioner of Social Security pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

# I. INTRODUCTION

The plaintiff filed an application for DIB on November 30, 2001, alleging disability due to numbness in her hands, back, and feet, seizures, heart problems and brain problems, with an alleged onset date of September 15, 2000. (Tr. 74, 101.)[2] Her application was denied initially (Tr. 73-74), and upon reconsideration. (Tr. 82-83). A hearing before Administrative Law Judge ("ALJ") Mack Cherry was held on June 22, 2004, at which time the plaintiff was represented by counsel. She and Jane Brenton, a vocational expert ("VE"), testified. On October 28, 2004, the ALJ found that the plaintiff was disabled as of August 15, 2003, but not before that date. (Tr. 19-28.) The Appeals Council denied the plaintiff's request for review of that decision on July 14, 2006 (Tr. 8),[3] and the ALJ's decision became the final decision of the Commissioner.

The plaintiff timely filed her complaint, but, upon the defendant's motion to remand for another administrative hearing since the recording of the June 22, 2004, hearing was inaudible (Docket Entry No. 8), the case was remanded and closed by order entered January 17, 2007 (Docket Entry No. 9). Upon the defendant's motion to reopen, in which counsel for the defendant explained that "[f]or reasons unknown," an administrative record had been prepared (Docket Entry No. 10), the case was reopened by order entered March 6, 2007 (Docket Entry No. 11). Thereafter, the

---

[2] These are the conditions the Social Security Administration indicated that the plaintiff had asserted when she initially applied for benefits. The portion of the plaintiff's application on which she listed her alleged disabling conditions is illegible; only "seizures-heart . . . hands . . . Feet also go to sleep And I fall -severe pain in back. I black out due to seizures. Pains down left arm" is legible. (Tr. 120.) In her memorandum in support of her motion for judgment on the record, the plaintiff lists her disabling conditions as "fibromyalgia, seizures, lymphoma, and depression." Docket Entry No. 16, at 2.

[3] The date of the Appeals Council decision is either missing or obscured. However, the index indicates that the date of the decision was July 14, 2006 (Tr. 2), and the both parties appear to agree on that date. See Docket Entry Nos. 16, at 1, and 23, at 2 n.1.

2

plaintiff filed a motion for judgment on the record, the defendant filed a response, and the plaintiff

filed a reply.  See Docket Entry Nos. 15-16, 23, and 24.


## II.  BACKGROUND

The plaintiff was born on July 9, 1962, and was 41 years old at the time of the hearing before

the ALJ, and 42 years old as of the date of the ALJ's decision.  (Tr. 19, 36, 101.)  She is a high

school graduate (Tr. 36), who had been employed as a master barber (Tr. 36), a trucker's assistant

(Tr. 37), and a cashier (Tr. 68).

It appears that the plaintiff began to see Dr. Kimberly Peaslee in April of 1999, for

complaints of fatigue.  Dr. Peaslee noted that the plaintiff was significantly obese and had a history

of hypothyroidism.  (Tr. 191.)  She prescribed her Elavil, and opined that "[t]his certainly almost

sounds like a fibromyalgia picture," since the plaintiff had "numerous tender points."  Id.  Two

months later, Dr. Peaslee related that the plaintiff complained of inability to sleep and inability to

stop crying.  She diagnosed the plaintiff with "significant depression," and gave her Prozac samples.

(Tr. 188.)  She also diagnosed the plaintiff with lower extremity edema and prescribed her Dyazide.

Id.  In August of 1999, Dr. Peaslee increased the plaintiff's dosage of Prozac for her depression,

increased her Elavil for her sleeping problems, and noted that she had lost an "amazing 24 pounds."

 (Tr. 186.)

In December of 1999, Dr. Peaslee treated the plaintiff for sinusitis, found her depression

"stable," and noted "a little bit of increasing joint pain."  (Tr. 185.)  In March of 2000, she  reported

that the plaintiff had lost 50 pounds in the last year, and was "really doing great," noting no other

problems.  (Tr. 183.)  In August of 2000, Dr. Peaslee reported that the plaintiff had related a "3-week

3

history of pain in her elbows, knees, shoulders and wrists," that she was still not able to sleep, and that she had gained 11 pounds. Dr. Peaslee diagnosed her with "significant osteoarthritis" and encouraged her "again" to exercise more to help her lose weight. (Tr. 181.) In February of 2001, Dr. Peaslee treated the plaintiff for sinusitis/bronchitis. Although the plaintiff complained of severe pain in her left rib, an x-ray showed no evidence of a fracture. Dr. Peaslee did not note any other problems. (Tr. 178.) Again, in March of 2001, Dr. Peaslee treated the plaintiff for bronchitis and a yeast rash, but noted no other problems. (Tr. 177.)

In April of 2001, the plaintiff began seeing Dr. Robert Wood (Tr. 310.) He noted that she was in severe pain and unable to "get relief," diagnosed her with fibromyalgia,[4] and treated her with medication. (Tr. 310.)[5] The plaintiff saw Dr. Wood again in May and September of 2001 (Tr. 307-09), and, when the plaintiff complained of "left arm tingling and numbness," she was referred to Dr. Randy Gaw, a neurologist, for further examination. (Tr. 307.)

The plaintiff first saw Dr. Gaw on October 1, 2001, and told him that she had experienced "a tingling paresthesia to her left upper extremity" for two weeks, and for six months she had experienced "episodes of alteration in mental state in which she would feel as though she were to lose consciousness." (Tr. 197.) Dr. Gaw noted that the plaintiff was taking Synthroid, Estrace, Prozac, Elavil, and a diuretic. Tinel's sign was positive in both wrists, and Dr. Gaw ordered a battery of further testing. (Tr. 304-306.) MRIs of the brain and cervical cord were "entirely normal,"

---

[4] Fibromyalgia is a medical condition marked by "chronic diffuse widespread aching and stiffness of muscles and soft tissues." *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th Ed. 2005). The disorder may also manifest itself in the form of debilitating fatigue and sleep disturbance. *Attorneys' Dictionary of Medicine,* Vol. 2, at F-81 (Matthew Bender & Co.)(1999).

[5] Dr. Wood's treatment notes are very difficult to read.

4

as was an x-ray of the cervical spine. (Tr. 200-203, 302.) An EMG of her left arm showed no "electrophysiologic evidence to support a focal or generalized neuropathic or myopathic process involving the left upper extremity," and a Duplex Carotid Doppler Study was also unremarkable. (Tr. 202, 300-302.)

Although her EMG had not shown evidence of carpel tunnel, on October 9, 2001, Dr. Gaw placed her in a wrist splint, gave her Vitamin B for possible carpal tunnel syndrome, and indicated that he would consider physical therapy for possible thoracic outlet syndrome if her tingling and numbness symptoms persisted. (Tr. 302.) Expressing concerns about the "possibility of sensory seizure," Dr. Gaw prescribed Topamax and Aspirin for the plaintiff on October 26, 2001.

On November 30, 2001, the plaintiff reported a complete resolution of her symptoms (Tr. 297). However, during a follow-up examination in December of 2001, the plaintiff told Dr. Gaw that she had lost consciousness twice for short periods of time. Dr. Gaw recommended an echocardiogram and a "Halter Monitor," and increased her dosage of Topamax. (Tr. 296.)

In December of 2001, the plaintiff also reported to Dr. Wood that she was continuing to have episodes in which her mouth would become dry, she could not swallow, and she would lose consciousness. (Tr. 222.) Dr. Wood referred the plaintiff to Dr. Michael Lenhart, a cardiologist, for further evaluation of her syncope and SVT.[6] (Tr. 212.) Dr. Lenhart noted that the plaintiff was using a Duragesic patch, and taking Prosac, estradiol, triamterene/hydrochlorothiazide, Levoxyl, Trileptal, Zantac, and Ultram. His review of her musceulosketletal system was positive for fibromyalgia and chronic back pain. An echocardiogram was within normal limits (Tr. 215-216),

---

[6] Syncope is defined as "a sudden brief loss of consciousness." *Merck Manual* (17th ed.), at 1603. "SVT" is an abbreviation for supraventricular tachycardia, which may cause syncope. *Id.* at 1651.

5

and he opined that the "dysrhythmia [was] most compatible with atrial flutter," which he believed to be related to the plaintiff's heavy caffeine and nicotine intake. (Tr. 213.) He also opined that the plaintiff's syncope was "more compatible with neurocardiogenic mechanism," and recommended that she discontinue her diuretic and begin a low dose beta blocker.

In February 2002, Dr. Reeta Misra, a non-examining, consultative physician, conducted a Physical Residual Functional Capacity ("RFC") Assessment, finding that the plaintiff had no exertional, postural, visual, communicative or manipulative limitations (Tr. 223-228.) Interestingly, Dr. Misra noted that "[p]ain is not alleged and [did] not factor into [the] assessment." (Tr. 225.)

On referral from Dr. Wood, Dr. Sivalingam Kanagasegar, a rheumatologist, began to treat the plaintiff in March of 2002 for fibromyalgia. (Tr. 261.) Upon examination, Dr. Kanagasegar found diffused soft tissue tender points around the back of the neck, anterior chest, posterior chest, and both arms and legs, "suggestive of fibromyalgia." He noted the medications prescribed to the plaintiff, including Paxil, Zantac, Levoxyl, Ultram, Flexeril, Amitriptyline. (Tr. 261.) He also prescribed Neurontin in hopes that it might help her fibromyalgia and her numbness in her arms and legs. (Tr. 262.) In a hand-written note at the bottom of his typed notes, he wrote, "Assessment: Chronic Fibromyalgia Syndrome." Id.

On May 2, 2002, Dr. Kanagasegar reported that the plaintiff was "in distress because of the pain" that was "significant" in both arms, legs, lower back and "sometimes around the back of the neck," as a result of which she "can't even walk" and "[e]ven doing daily activities at home have became very difficult." (Tr. 258.) Dr. Kanagasegar increased her dosage of Neurontin, advised her to stop taking the Amitriptyline, and started her on Zyprexa.

Case 2:06-cv-00072   Document 28   Filed 07/09/09   Page 6 of 29 PageID #: 79

On May 2, 2002, Dr. Kanagasegar also completed a Fibromyalgia Residual Functional Capacity ("RFC") Questionnaire (Tr. 250-253, 257), in which he noted that the plaintiff met the American Rheumatological criteria for fibromyalgia, and identified the plaintiff's symptoms as multiple tender points, nonrestorative sleep, chronic fatigue, subjective swelling, chronic fatigue syndrome, numbness and tingling, and anxiety. (Tr. 250.) He identified the location of the plaintiff's pain as lumbosacral spine, cervical spine, chest, shoulders, arms, hands/fingers, hips, legs, and knees/ankles/feet, all bilaterally. (Tr. 251.) He described the plaintiff's impairments as consistent with her symptoms and functional limitations, and opined that the plaintiff was not a malingerer and that her prognosis was "fair." (Tr. 150-251.) He reported that the plaintiff's pain was so severe that it would frequently interfere with her attention and concentration, and that she was incapable of even "low stress" based on the plaintiff's statement to him that "she can't tolerate the stress." (Tr. 251-252.) Dr. Konagasegar related that she is not able to walk even one city block based on her statement to that effect, that she could sit continuously for one hour at a time, but could only stand for 15 minutes at a time, could sit, stand/walk less than two hours in an eight hour day, would need to take unscheduled breaks every hour for 15 minutes to lie down, and could never lift 20 pounds but could occasionally lift up to ten pounds. (Tr. 252-253.) He also noted that the plaintiff had significant limitations in doing repetitive reaching, handling, or fingering, could stoop and crouch very little, that she would have "good days" and "bad days," and that she would likely be absent from work "about once a month." (Tr. 257.)

On May 2, 2002, Dr. Wood also completed a Fibromyalgia RFC Questionnaire. (Tr. 230-234.) While both Dr. Wood and Dr. Konagasegar agreed that the plaintiff was suffering from fibromyalgia, they did not agree entirely on the plaintiff's symptoms. Dr. Wood's listing of the

plaintiff's symptoms was more extensive, including multiple tender points, nonrestorative sleep, chronic fatigue, muscle weakness, subjective swelling, carpal tunnel syndrom, numbness and tingling, breathlessness, anxiety, panic attacks, depression, and hypothyroidism.   (Tr. 230.) Dr. Konagasegar did not list muscle weakness, carpel tunnel syndrome, breathlessness, panic attacks, depression, or hypothyroidism, as did Dr. Wood.  On the other hand, Dr. Konagasegar listed both chronic fatigue and chronic fatigue syndrome, whereas Dr. Wood only listed chronic fatigue.[7]

Dr. Wood agreed with Dr. Kanagasegar that the plaintiff was not a malingerer and indicated the same locations of pain as Dr. Kanagasegar had. (Tr. 231.)  Dr. Wood opined that the plaintiff's pain was so severe that it would "constantly" interfere with "attention and concentration" (Tr. 232), whereas Dr. Kanagasegar had described the level of interference as "frequently."  Dr. Wood agreed with Dr. Kanagasegar that the plaintiff was incapable of even "low stress" and could walk less than one city block without rest or severe pain.  Id.

Dr. Wood concurred with Dr. Kanagasergar that the plaintiff could stand/walk for less than two hours, but opined that the plaintiff could sit about two hours in an eight hour day.  Id.  Dr. Wood further related that the plaintiff would have to take 30 minute unscheduled breaks frequently. (Tr. 233.)  Although Dr. Kanagasegar had reported that the plaintiff could occasionally lift and carry 10 pounds or more, Dr. Wood opined that she could never lift and carry any amount–even less than ten pounds.  Id.

Dr. Wood agreed with Dr. Kanagasegar that the plaintiff had significant limitations in repetitive reaching, handling or fingering, that she could not stoop or crouch, and that she was likely

_____

[7] It is not clear whether there is a difference between the symptoms of "chronic fatigue" and "chronic fatigue syndrome."

8

to have "good days" and "bad days." (Tr. 234.)  Although Dr. Kanagasegar opined that the plaintiff

was likely to be absent from work about once a month, Dr. Wood determined that she would be

absent more than four times a month.[8]  Id.

On June 10, 2002, the plaintiff saw Dr. Kanagasegar again.  He reported that she was only

in "mild distress because of the pain" and that she had developed "pitting ankle edema up to both

knees."  He prescribed Hydrocodone for the pain and recommended that Dr. Wood consider

referring her to a pain specialist.  (Tr. 48.)

On June 28, 2002, the plaintiff submitted to a consultative psychological evaluation

conducted by Mark Loftis, M.A., apparently in conjunction with or under the supervision of

psychologist William R. Sewell.  (Tr. 235-238.)  During the examination, the plaintiff acknowledged

that she was "involved with the community" and attended church on Sundays and Wednesdays.

(Tr. 236.)  She was using a cane, had a tan with what appeared to be professionally manicured nails,

and reported that she tried to do some chores around the house, although her son and husband "do

help" and do "most of the grocery shopping." (Tr. 236.)

The plaintiff reported inability to sleep more than four to five hours, persistent fatigue,

recurring crying spells, "some suicidal thoughts," paranoia, sensory distortions, depression, and

chronic pain.  She was diagnosed with a depressive disorder, an anxiety disorder, fibromyalgia, and

a GAF score of 60.[9]  (Tr. 237.)  However, she did not appear to have "significant cognitive

---

[8]In fact, it appears that Dr. Wood wrote in his own handwriting that the plaintiff was likely
to be absent "about 4 x a week."

[9]  A GAF score of 51-60 falls with the range of "[m]oderate symptoms [or] moderate
difficulty in social, occupational, or school functioning."  Am. Psychiatric Ass'n, *Diagnostic and
Statistical Manual of* Mental *Disorders* ("DSM-IV-TR") (4th ed. 2000), at 34.

9

impairments that would prevent employment," she could "interact appropriate (sic)," was "partially integrated with the community," and appears to have "pretty good interpersonal relationships." (Tr. 237.) She was found to be moderately limited in her ability to "tolerate stress associated with daily activities." (Tr. 237.)

In September of 2002, Dr. Glenda Knox-Carter, a non-examining, consultative physician, conducted a Physical RFC Assessment (Tr. 264-269). Dr. Knox-Carter opined that the plaintiff's "allegations of pain are partially credible" (Tr. 268), and that the limitations and restrictions placed on the plaintiff by Drs. Wood and Kanagasegar were not supported by objective medical findings. (Tr. 269.)

It appears that Dr. Wood continued to treat the plaintiff in 2002 and 2003. When she tested positive for anemia, he referred the plaintiff to Dr. David Tabor, an oncologist. (Tr. 427.) At her first visit to Dr. Tabor on November 14, 2003, he noted that she had a "long history of fibromyalgia," suffered from hypothyroidism, exogenous obesity, and depression, and was prescribed "numerous medications," including Estratest, Levoxyl, Paxil, Lorzepam, Keterolac, Prevacid, Neurontin (for peripheral neuropathy), Flextra, Flextra-DS, and Ranitidine. Id. Further testing on December 11, 2003, revealed that the plaintiff had non-Hodgkin's lymphoma.[10] (Tr. 387, 413.) She received her first round of immunotherapy through January 26, 2004. (Tr. 394.) On February 10, 2004, Dr. Tabor opined that, as a result of her non-Hodgkin's lymphoma, the plaintiff "should be considered disabled from any useful occupation." (Tr. 387.)[11]

_____

[10]Dr. Tabor described non-Hodgkin's lymphoma as a malignancy involving the lymph glands, and advised that she was in stage III B.

[11] The record contains statements from the Laboratory Corporation of America to Dr. Tabor regarding a patient who is not a party to this litigation. *See* Tr. 401-404.

10

### III. THE ALJ'S FINDINGS

Based on the record, the ALJ made the following findings:

1.    The claimant had met the insured status requirements of the Act as of the established disability onset date, August 15, 2003.

2.    The record indicates that the claimant has not engaged in substantial gainful employment since she filed her application on November 30, 2001.

3.    Prior to August 15, 2003, the claimant had a combination of impairments considered "severe," which included obesity, syncopal episodes, fibromyalgia, depression and anxiety.

4.    This combination of impairments did not meet or medically equal the impairments listed in Appendix 1, Subpart P, Regulation No. 4.

5.    Prior to August 15, 2003, the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.    Prior to August 15, 2003, the claimant had the residual functional capacity to perform light work activity which would accommodate the occasional lifting and/or carrying of 20 pounds; frequent lifting and/or carrying of 10 pounds; standing and/or walking for six out of eight pounds; no climbing of ladders, ropes or scaffolds; occasional climbing of stairs and ramps; occasional balancing, stooping, bending and kneeling; no crouching and crawling; and the avoidance of exposure to temperature extremes, dampness, wetness, humidity, unprotected heights and hazardous machinery. Her rfc also includes moderate limitations in the ability to understanding (sic), remember and carry out detailed instructions; maintain attention/concentration for extended time; deal with the general public; work with co-workers without being distracted; adapt to changes in the work environment; complete a normal workday without interruptions by psychological symptoms; and perform at a consistent pace without unreasonable breaks.

7.    Prior to August 15, 2003, the claimant was able to perform all of her past relevant work.

8.    The claimant is 42 years old and has a high school education.

9.    There are no transferable skills.

10.    Based on VE testimony and considering the claimant's age, education, work experience and residual functional capacity prior to August 15, 2003, there are a significant number of jobs in the national economy that she could perform; therefore,

11

using Medical-Vocational Rule 202.14 as a framework for decision making, a finding of "not disabled" is appropriate.

11.    The claimant was "not disabled," as defined in the Act, at any time from September 15, 2000 through August 14, 2003.

12.    Since August 15, 2003, the claimant has had a combination of impairments considered "severe," which includes cancer (lymphoma), obesity, fibromyalgia, depression and anxiety.

13.    Since August 15, 2003, the claimant has had no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

14.    Since August 15, 2003, the claimant has had the residual functional capacity to perform less than sedentary work activity.

15.    Since August 15, 2003, the claimant has been unable to perform any past relevant work.

16.    Since August 15, 2003, considering the claimant's age, education, work experience and residual functional capacity, a finding of "disabled" can be reached by using Medical-vocational Rule 201.00(h) as a framework for decision making.

17.    The claimant has been "disabled," as defined in the Act, since August 15, 2003.

(Tr. 27-28.)

# IV. DISCUSSION

## A.    Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases).  The Commissioner's decision must be affirmed if it is supported by substantial

evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Secretary of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

13

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Secretary of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant

work, or proving that a particular past job should not be considered relevant. *Smith v. Secretary of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[12] *Id. See also Tyra v. Secretary of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Secretary of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d

---

[12] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

15

860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B.  The Five-Step Inquiry

The ALJ resolved the plaintiff's claim at step four of the five-step inquiry and, alternatively, at step five.  At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since November 30, 2001.  At step two, the ALJ found that the plaintiff suffered from a combination of severe impairments, including obesity, syncopal episodes, fibromyalgia, depression, and anxiety.  At step three, the ALJ determined that her impairments did not meet or medically equal the impairments listed in Appendix 1, Subpart P, Regulation 4.  At step four, the ALJ found, based on the testimony of the VE, that the plaintiff was capable of performing her past relevant work as a hair stylist, cashier, and truck driver's helper.  Alternatively, the ALJ found at step five that the plaintiff could perform other substantial gainful employment available in the national economy.  Specifically, the ALJ relied on the VE's testimony that the plaintiff could perform light, unskilled work as a companion,  inspector, or filing clerk, and sedentary, unskilled work as a security surveillance monitor, inspector, or order clerk.  (Tr. 26, 70.)

The ALJ determined found that the plaintiff was disabled and entitled to benefits as of August 15, 2003.  (Tr. 27, 28).  Obviously, the plaintiff does not dispute this conclusion, but does challenge the ALJ's finding that she was not disabled from September 15, 2000, through August 14, 2003. (Tr. 26, 28.)

It is not entirely clear whether the plaintiff challenges the portion of the ALJ's decision denying the plaintiff benefits from September 15, 2000, through November 30, 2001, since the

16

plaintiff does not address the ALJ's findings for that time period at all. However, the plaintiff argues that the plaintiff is entitled to benefits "since at least April of 2001," Docket Entry No. 16, at 8, which is when the plaintiff began seeing Dr. Wood. However, since the plaintiff, at least nominally, challenges the denial of her benefits for the entire period of time prior to August 14, 2003, the Court will briefly address the first portion of that time period.

### (1) Substantial Gainful Activity from September 15, 2000, through November 29, 2001

The plaintiff claims that she was unable to work from September 15, 2000, through August 14, 2003. However, in 2000, she earned $22,478.00, and, in 2001, she earned $24,409.00. (Tr. 105.) When questioned about this inconsistency, the plaintiff attributed the 2001 income to her husband and simply testified "that's just the way the tax lady wrote it up." (Tr. 63.)

The ALJ found plaintiff's testimony on this point to be less than credible and determined that she had been gainfully employed through November 29, 2001 (Tr. 20), thus negating her entitlement to DIB during that particular period of time.[13]

A claimant who is performing substantial gainful activity is not disabled, no matter how severe her medical condition may be. *Dinkel*, 910 F.2d at 318. Work activity that results in earnings above the regulatory guidelines defining substantial gainful activity creates a presumption that the claimant is engaged in substantial gainful activity. *Tyra*, 896 F.2d at 1029. The plaintiff's earnings for the calendar years 2000 and 2001 clearly exceed the regulatory guidelines for earned income. *See* 20 C.F.R. § 404.1574(b)(2). The plaintiff was not able to overcome the presumption that she had

---

[13] The ALJ referred to this statement as "testimony embellishment." (Tr. 20.) Of note is the fact that the plaintiff's husband was present at the administrative hearing (Tr. 33) but was not called as a witness to corroborate his wife's testimony on this point.

17

been gainfully employed during this period of time. There was, therefore, substantial evidence in the record to support the ALJ's finding that the plaintiff was not disabled for the period of time covering September 15, 2000, through November 29, 2001.

### (2) Disability from November 30, 2001, to August 15, 2003

The question thus becomes whether the plaintiff was disabled from November 30, 2001, the date she filed the application for DIB benefits, through August 14, 2003. The plaintiff contends that the ALJ's determination that she had the residual functional capacity to perform her past relevant work or other light work is not supported by substantial evidence in the record. (Tr. 27-28.)

Residual functional capacity is defined as what a claimant can do on a sustained, regular and continuing basis. *Cohen v. Secretary of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992). The ALJ found that, prior to August 15, 2003, the plaintiff had the residual functional capacity to perform light work. He specifically found that she had the RFC to perform her past work, but, alternatively, found that there were jobs, other than her past jobs, that she could perform.

### (3) Plaintiff's Assignment of Error

Again, it appears that the plaintiff contends that the plaintiff was unable to perform even sedentary work from April of 2001. Docket Entry No. 16, at 8. However, the Court finds that the relevant time period is only the period of time between November 30, 2001, and August 14, 2003, as addressed above. The plaintiff asserts that the ALJ erred in rejecting the opinions of her treating rheumatologist, Dr. Kanagasegar, and treating primary care physician, Dr. Wood, both of whom determined that the plaintiff was unable to perform any type of work. Docket Entry No. 16, at 8.

18

In her memorandum in support of her motion for judgment on the record, the plaintiff asserts only one assignment of error. When the defendant suggested in its response to the motion that the plaintiff appeared to accept the ALJ's findings regarding the plaintiff's credibility, *see* Docket Entry No. 23, at 10, the plaintiff replied that, although she chose to focus on the lack of weight given to the plaintiff's treating physicians, she did not agree with the ALJ's credibility determination. Docket Entry No. 24. At bottom, however, the plaintiff did not raise the ALJ's credibility determination as an assignment of error, other than to argue that the ALJ should not have taken into account an inconsistency between a third party's statement about the plaintiff's daily activities and the plaintiff's own statements, particularly when the plaintiff's own statements reflected less restrictive daily activities than the statement of the third-party. However, it is virtually impossible to totally divorce the issue of credibility, upon which the ALJ significantly relies, from the weight to be given to the opinions of the treating sources.

There is no question that both Dr. Kanasergar and Dr. Wood were treating physicians or treating sources under 20 C.F.R. § 404.1502.[14]

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R.

---

[14]A treating source is defined in 20 C.F.R. § 401.1502 as:

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

§ 416.927(d)(2).  Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  This is commonly known as the treating physician rule.  *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004).  When a consulting physician has given an opinion contrary to that of a treating physician, the treating physician's opinion is still entitled to a great deal of weight.  *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).  Although the ALJ may properly reject the opinion of a treating physician when the opinion is not sufficiently supported by medical findings, *see Combs v. Commissioner*, 459 F.3d 640, 652 (6th Cir. 2006) (*en banc*), if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighted using all of the factors provided in 20 C.F.R. 404.1527 . . . .'"  *Fisk v. Asture*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec. Rul 96-2p, 1996 WL 374188, at *4) (emphasis in original).  The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart,* 192 Fed.Appx. 456, 161 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)).  The ALJ must also provide "good reasons" for the resulting weight given to the treating source.   Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)).  The "good reasons" must be "sufficiently specific to make

clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id. See also Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987).

In May of 2002, Dr. Wood completed a Fibromyalgia RFC Questionnaire for the plaintiff, concluding that she was in constant pain, incapable of handling even low stress work situations, unable to sit or stand for extended periods of time, and unable to lift or carry any weight in a competitive work situation. (Tr. 232-233.) When asked to explain the reasons for his conclusions, Dr. Wood simply wrote "in constant pain - unable to consistently do housework." (Tr. 232.)

Dr. Kanagasegar also completed a Fibromyalgia RFC Questionaire for the plaintiff. (Tr. 250-257.) He noted that the plaintiff's pain was frequent but not constant, and that the plaintiff's physical impairments were severe, but not quite as debilitating as those described by Dr. Wood. Like Dr. Wood, he concluded that the plaintiff was incapable of handling even low stress work situations, writing "[s]he says she can't tolerate the stress." (Tr. 252.)

The ALJ chose to assign less weight to the opinions of these treating physicians for three reasons. First, there was an absence of any objective medical test results that would support a finding that the plaintiff was so disabled as to be unable to work. Second, their opinions were based almost completely upon the plaintiff's expressed complaints of pain and stress. Finally, the plaintiff's recitation of daily and social activities were inconsistent with their findings. (Tr. 25.)

While credibility determinations with respect to subjective complaints of pain rest with the ALJ rather than a treating physician, *Allen v. Commissioner of Social Security,* 2009 WL 791552 (6th Cir. Mar. 27, 2009), citing *Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918,920 (6th Cir. 1987), the nature of fibromyalgia is such that objective medical tests are of little relevance

in determining the existence or severity of the disease. *Rogers*, 486 F.3d at 243. As a consequence, it is not surprising that the plaintiff's treating physicians do not have objective medical test results to support their opinions.[15]

The ALJ relied, in part, on the consultative RFC Assessments of Dr. Misra and Dr. Knox-Carter. Neither actually examined the plaintiff. It is not clear whether either is a specialist in any relevant area. In contrast, Dr. Kanagasegar is a rheumatologist and, as such, is the relevant specialist for fibromyalgia. *See Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996) ("[f]ibromyalgia is a rheumatic disease and the relevant specialist is a rheumatlogist"); *Anderson v. Social Security Admin.,* No. 3-07-0343, slip op. at *11 (M.D. Tenn. Sept. 10, 2008) (Wiseman, J.) (a rheumatologist is the appropriate specialist to "confirm a diagnosis of fibromyalgia:); *Cole v. Commissioner of Social Security,* 2008 WL 4225775, at *7 (E.D. Mich. Sept. 9, 2008) (a rheumatolgoist is a specialist in fibromyalgia).

---

[15]The Court of Appeals for the Sixth Circuit has cited the Seventh Circuit Court of Appeals with approval in describing the difficulties in diagnosing fibromyalgia:

> [F]ibromyalgia, also known as fibrositis[,] is a common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and–the only symptom that discriminates between it and other diseases of a rheumatic character–multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Huffaker v. Metropolitan Life Ins. Co.,* 271 Fed.Appx. 493, 2008 WL 822262, *6 n.2 (6th Cir. Mar. 25, 2008) (quoting *Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 814, 916 (7th Cir. 2003) (internal quotation marks, alterations, and citations omittted0.

22

Dr. Misra completed a physical RFC Assessment on February 13, 2002, for the primary diagnosis of "syncopal d/o, the secondary diagnosis of obesity, and the "other alleged impairment" of "LUE paresthesia." It appears that Dr. Misra was not evaluating the plaintiff's RFC in relation to her fibromyalgia. Even more telling is that there were no treating or examining source statements available for her review. (Tr. 228.) Based on her acknowledgment that "[p]ain is not alleged and does not factor into assessment," it is clear that she did not consider whether or not the plaintiff had disabling pain.

Dr. Knox-Carter completed a RFC Assessment on September 20, 2002, for the primary diagnosis of "syncopal DO," and the secondary diagnosis of "cardiac arrthythmias," with fibromyalgia listed as "other alleged impairment." (Tr. 264.) Dr. Knox-Carter noted that Dr. Kanagasegar's and Dr. Wood's restrictions were based on the plaintiff's own statements and not on objective medical findings. While that may, at least to a great extent, be true, Dr. Knox-Carter did not give any recognition to the subjective nature of the symptomatology of fibromyalgia.

The plaintiff appears to contend that the time frame at issue is from April 2001, to August 15, 2003. Docket Entry No. 16, at 8. The beginning of that time period appears to be based on the beginning of her treatment with Dr. Wood.

If the issue were whether the ALJ properly gave more weight to the consultative, non-examining physicians than to the plaintiff's treating physicians related to the plaintiff's alleged impairments of depression and anxiety, the Court would agree with the defendant. No doctor referred the plaintiff to in-patient or out-patient mental health treatment or other counseling or therapy, and treated her only with medication. If the issue were whether the ALJ properly gave more weight to her consultative, non-examining physicians than to the plaintiff's treating physicians

23

related to the plaintiff's physical impairments other than fibromyalgia, the Court would also agree with the defendant. There were no diagnostic tests or other objective basis to support a finding that the plaintiff could perform less than sedentary work based on those conditions.

However, the Court agrees with the plaintiff that the ALJ should not have provided greater weight to the opinions of Dr. Misra and Dr. Knox-Carter than the opinions of the plaintiff's treating physicians, particularly the opinion of Dr. Kanagasegar, a rheumatologist. Dr. Misra did not even consider pain. Dr. Knox-Carter discounted the limitations provided by the plaintiff's treating physicians, explaining that they were not based on objective medical findings. To the extent that she considered fibromyalgia rather than the plaintiff's other impairments, her failure to recognize that the symptoms of fibromyalgia cannot be confirmed by "objective medical findings" provides less weight to her opinion.

The question then becomes whether the ALJ properly discounted the opinions of the plaintiff's treating physicians, without consideration of the opinions of non-examining, consultative physicians, because the opinions of her treating physicians were based on her own subjective complaints of pain and limitations.

The ALJ explained that "[e]vidence of symptom exaggeration, lack of initiative in seeking vocational rehabilitation assistance and noncompliance with treatment recommendations for exercise, smoking cessation and weight loss, cause credibility to be adjudged as no more than fair." (Tr. 23.) Although the ALJ did not specifically include it in that listing, another factor that he addressed in the body of his decision was that he seriously questioned her credibility on the issue of gainful employment prior to November 30, 2001. In addition, the ALJ relied on the plaintiff's

own recitation of her daily and social activities, and the normal results of radiographic and electrodiagnostic tests. (Tr. 200-203, 208, 213, 216, 300-301, 528.)

There is no evidence in the record that the plaintiff ever failed to take advantage of any vocational rehabilitation program offered to her or to which she was referred.[16]  The Court further discounts the ALJ's reliance on her physicians' failure to consider surgery since there is no evidence in the record that surgery would be available for the treatment of fibromygalia.  Similarly, it is not clear that physical therapy would have served any useful purpose related to her fibromygalia.[17]  However, the Court must credit the ALJ for pointing out that the plaintiff was never referred to any pain management program, although Dr. Kanagsegar had suggested that Dr. Wood consider such a referral.  (Tr. 48.)  The plaintiff was essentially treated only with medication.  However, the plaintiff was advised to exercise and stop smoking,  *see, e.g.,* (Tr. 262), and there is no indication that she did either.  Although there was a period of time in 1999, during which the plaintiff lost weight, it does not appear that she was able to sustain that  weight loss or continue weight loss.  It is also not clear the extent to which her weight contributed, if at all, to her fibromygalia.

_____

[16]  The Court was unable to find any referral to a vocational rehabilitation program in the record.  The only mention of such a program was in a Disability Report that the plaintiff completed on December 17, 2001, in which she responded "Yes" to the printed question, "Would you like to receive rehabilitation services that could help you get back to work?"  (Tr. 126.)  In addition, the record contains a one-page Tennessee Department of Human Services Vocational Assessment, apparently dated September 25, 2002, which is totally illegible.  Further, it does not appear that the ALJ specifically relied on that assessment.

[17]  On October 9, 2001, Dr. Gaw indicated that he would consider physical therapy for thoracic outlet syndrome if her tingling and numbness symptoms persisted (tr. 302),  but it does not appear that she was ever referred to physical therapy.  (Tr. 161.)  In addition, Dr. Gaw was not examining or treating the plaintiff for fibromyalgia.

25

In addition, the ALJ relied on the plaintiff's own reports of her daily activities that were inconsistent with the limitations and restrictions that her treating physicians provided. In May of 2002, the plaintiff completed a pain questionnaire in which she recounted activities such as household chores, driving, socializing, and shopping with her husband. (Tr. 157.) A reading of that pain questionnaire that the plaintiff was engaged in many activities that were not consistent with the limitations that her treating physicians provided parses out of context particular portions of the questionnaire, ignoring her responses to the questionnaire as a whole.

In that questionnaire, the plaintiff described her pain as "like some one is cutting you or sticking you and then pouring alchol (sic) all over your body and then a sharp pain will hit you and take your breath away." (Tr. 156.) She recounted that she experiences pain daily when she is standing up, getting up, bending over, lying down, or sitting. *Id.* She described her daily activities as follows: "I don't do any of this Daily. Monthly I do if able some household chore. Driving when I have to. Sociatizing (sic) sometime if I have to or feel that I have to. Shopping only when husband or step son is with me . . . ." (Tr. 159.) She concluded that "I just wish that a mircle (sic) would happen and I would not have to deal with all the pain. I feel that it (sic) going to be the death of me." *Id.*

In her undated report of Activities of Daily Living, the plaintiff reported that she "can't stand or sit or used (sic) my hands and feet or back for any length of time," "as far as I can see I have no life, having to depend on anyone," that she is "lucky" to get four hours of sleep a night, that her circumstances seemed hopeless, that she has to depend on others to "take care of" herself, that she goes outside three to five times a week to get her mail or stand on her back porch, and, when she leaves her home, her husband or family member drives her, that her activities outside her home

26

include going to church, the doctor, and "sometime" "Lady's Nite Out," which appears to be a church activity, that, although she cooks three to four times a month, she needs help lifting pans and opening cans or jars, that she needs help lifting a laundry basket, and that she cannot lift pans from her cabinet or clean house.  (Tr. 164-169.)

These responses tracked her description of her pain and physical limitations in her testimony at the hearing before the ALJ, see (Tr. 47-52), and are not inconsistent with the assessments of the plaintiff's treating physicians of her pain and limitations.

The ALJ also referred to the observations of Mr. Loftis, who conducted a psychological evaluation of the plaintiff in June of 2002, and noted that the plaintiff had a tan and a professional manicure.  In addition to the fact that Mr. Loftis is not a specialist in fibromylagia or even a physician, these observations do not provide substantial evidence to support a determination that the plaintiff was exaggerating her symptoms.  Although the ALJ is correct that the treating physicians inevitably relied on the plaintiff's own subjective complaints and self-reporting, they were in the position to actually examine the plaintiff and observe her over the course of their treatment.  Both treating physicians concluded that she was not malingering.

Although the Court credits the ALJ's skepticism of plaintiff's reports of pain based on his finding of her lack of credibility on the issue of her gainful employment for the years 2000 and 2001, that finding does not provide substantial evidence to support his decision to  discount the reports of the plaintiff's treating physicians, particularly her rheumatologist.  Further, the Court finds that there is no other substantial evidence in the record to provide the basis for that decision.  The limitations provided by her treating physicians dictate a finding that the plaintiff is unable to perform even sedentary work, and thus she is entitled to benefits from March 1, 2002, the month Dr. Kanagasegar

began treating her for fibormyalgia, to August 15, 2003. Although Dr. Wood diagnosed the plaintiff with fibromyalgia in April of 2001, the Court finds that there is substantial evidence in the record to support the ALJ's determination that the plaintiff was not disabled as early as April of 2001. It was not until the plaintiff began treatment with Dr. Kanagasegar that the plaintiff's treatment began to focus on fibromyalgia rather than other physical conditions for which there are diagnostic tests and the need for supporting objective evidence. In addition, the Court has already found that the plaintiff was not entitled to benefits for the time period between April of 2001, and November 30, 2001, as addressed above.

# R E C O M M E N D A T I O N

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 15) be **DENIED** in part and **GRANTED** in part, that the Commissioner's decision, denying the plaintiff disability benefits for the period September 15, 2000, to March 1, 2002, be **AFFIRMED**, that the Commissioner's decision, denying the plaintiff disability benefits for the period March 1, 2002, to August 15, 2003, be **REVERSED**, and that the plaintiff be awarded DIB benefits for the period of time March 1, 2002, to August 15, 2003.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of entry of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Juliet Griffin
United States Magistrate Judge

29